IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SHERRIE LYNN SWAFFORD      )
                           )
v.                         )     No. 3:12-0614
                           )     Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:    The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for supplemental security income benefits, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 19). Plaintiff has further filed a reply brief in support of her motion (Docket Entry No. 22). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

## I. Introduction

Plaintiff filed her benefits application on December 4, 2008, alleging disability

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

due to bipolar disorder since January 1, 2007. (Tr. 214, 249) Plaintiff subsequently amended her alleged date of disability onset to December 4, 2008. (Tr. 36) Plaintiff's claim to benefits was denied at the initial and reconsideration stages of review before the state agency, whereupon plaintiff filed a request for de novo hearing by an Administrative Law Judge (ALJ). That hearing was held on August 31, 2010. (Tr. 33-63) Plaintiff appeared with counsel at the hearing and testified, as did an impartial vocational expert. At the conclusion of the hearing the ALJ took the matter under advisement, until October 8, 2010, when he issued a written decision denying plaintiff's disability claim. (Tr. 19-27) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 416.971 *et seq.*).

2. The claimant has major depressive disorder and history of cocaine dependence, which are considered a "severe" combination of impairments, but not severe enough, either singly or in combination, to meet or medically equal the requirements set forth in the Listing of Impairments. Appendix 1 to Subpart P, Regulations No. 4.

3. After consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels. Additionally, she can understand, remember and carry out two-to-three step directions; can maintain concentration and persistence for two-to-three step tasks with routine supervision; can have occasional interaction with the public; can relate to co-workers; and can adapt to infrequent workplace changes.

4. The claimant is unable to perform any past relevant work (20 CFR 416.965).

5. The claimant is 38 years old, described as a younger individual (20 CFR 416.963).

6. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

7. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

8. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

9. The claimant has not been under a disability, as defined in the Social Security Act, since December 4, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 21-22, 26-27)

On April 27, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-5), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from defendant's brief, Docket Entry No. 19 at 2-8:

The record contains some treatment notes which relate to Plaintiff's treatment and condition prior to her alleged onset date, December 4, 2008 (Tr. 259-403, 438-41). Since Plaintiff's alleged date of disability onset, she has received treatment from several healthcare providers, including a mental healthcare provider and a primary care provider. In addition, at the request of the State Disability Determination Service (DDS), her medical records have been reviewed by DDS physicians.

Since her alleged onset date through at least August 2010, Plaintiff received treatment and other assistance from Mental Health Cooperative (MHC) where her case was managed by Maisha Faulkner (Tr. 403 451- 534). Throughout her treatment at MHC Plaintiff's

conditions were identified as "Major Depressive Disorder, Recurrent, Unspecified Primary" and "Cocaine Dependence- Non-Primary" (Tr. 425, 428, 432, 435, 454-5, 458, 463-4, 468, 471, 482, 483, 489-90, 493, 499, 504, 510, 514, 521-2, 528). Her treatment at MHC involved home visits; however, on several occasions, Plaintiff was not at home when Ms. Faulkner arrived (Tr. 467, 472, 475-8, 486, 498, 503, 507, 509, 513, 523). Plaintiff also failed to attend several scheduled appointments with mental healthcare providers at MHC (Tr. 428, 468, 471, 499, 504, 528). Records from MHC also reflect that at various times, Plaintiff was not compliant with her prescribed medications (Tr. 429, 432, 482, 489, 502, 510).

On January 6, 2009, Carrie Brensike, Advance Practice Nurse (APN), of MHC noted that Plaintiff reported ongoing insomnia, acceptable appetite, and increased depression, anxiety, and irritability (Tr. 425). Plaintiff was noted to have a broad affect, to be adequately groomed, to be cooperative, and to have good eye contact. Plaintiff reported crying daily and agitation in response to stressful situations. Plaintiff also denied suicidal or homicidal ideation, and hallucinations, but reported seeing things, like insects, crawling on the floor. Plaintiff's dose of Prozac was increased and she was prescribed Trazodone for sleep (Id.).

On January 21, 2009, Rebecca P. Joslin, Ed.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity (RFC) Assessment at the request of the DDS (Tr. 404-421). Dr. Joslin classified Plaintiff's impairment as an affective disorder, major depressive disorder, evaluated under Listing 12.04, and cocaine dependency, in remission (Tr. 404-12). Dr. Joslin characterized Plaintiff's impairments as mild with respect to activities of daily living (ADLs) and moderate in the areas of maintaining social functioning and maintaining concentration, persistence, and pace (Tr. 414). Dr. Joslin noted no episodes of decompensation (Id.). More specifically, Dr. Joslin opined that Plaintiff had moderate limitations in five of 20 areas of functioning, but was not significantly limited in the remaining 15 areas (Tr. 418-9). Dr. Joslin also concluded that Plaintiff was able to understand and remember simple and detailed [instructions]; able, with some difficulty, to maintain attention, concentration, persistence, and pace; able, with some difficulty, to interact appropriately with the general public and with others without behavioral extremes; and able, with some difficulty, to adapt to changes (Tr. 420).

In March 2009, Plaintiff told Ms. Faulkner that she was "doing ok," though she reported continued irritability and "snap[ping] at people" (Tr. 431). Plaintiff requested an increased dose of Prozac, but reported sleeping better. The same month, APN Brensike noted that Plaintiff stated that she was compliant with her medications, but also stated that sometimes she take one instead of two and treatment notes reflect that Plaintiff should have run out of medication a month earlier (Tr. 432). Plaintiff also reported that she "can't function" if she is around too many people, was depressed, and having anxiety and racing

4

thoughts. Plaintiff had appropriate appearance, good eye contact, and denied hallucinations and suicidal or homicidal ideation (Id.). Zoloft was prescribed (Tr. 432-4). During a home visit on March 20, 2009, Plaintiff told Maisha Faulkner that she was "doing ok," compliant with her medications, and had no concerns (Tr. 461). On April 2, 2009, Ms. Faulkner noted that Plaintiff was messy and disheveled (Tr. 462). Plaintiff reported no concerns with her medications or anything else (Id.). The same month, APN Brensike noted Plaintiff reported depression "all the time" and anxiety, despite compliance with medications (Tr. 463). Plaintiff also stated that "if she takes her med[ications] she [has] no [problems] sleeping." Plaintiff had good eye contact and appropriate appearance, but red and puffy eyes. APN Brensike increased Plaintiff's dose of Zoloft (Id.).

On April 8, 2009, Victor O'Bryan, Ph.D., reviewed Plaintiff's record at the request of the DDS (Tr. 435, 437). Dr. O'Bryan noted that recent treatment notes reflected that Plaintiff had reported "some irritability," but had stated that she was "doing ok." Dr. O'Brien affirmed Dr. Joslin's January 21, 2009 assessment (Id.).

On April 13, 2009, Keith E. Junior, M.D., of United Neighborhood Clinic, treated Plaintiff for allergies, a cough, and lower back pain (Tr. 443). Dr. Junior noted that Plaintiff had no emotional disturbances, and no unusual anxiety or evidence of depression (Tr. 443).

During a home visit with Ms. Faulkner in May and June 2009, Plaintiff reported that she was "doing ok" and had no other concerns (Tr. 469-70, 474). On June 10, 2009, Ms. Faulkner opined that Plaintiff had a Global Assessment of Functioning (GAF) score of $45_3$ (Tr. 460). Ms. Faulkner also opined that Plaintiff had moderate impairments in ADLs; moderate impairments in interpersonal functioning; marked impairments in concentration and task performance (noting that she frequently missed appointments and was non-compliant with medication); and mild impairments in adaption to change (Tr. 458-60, 473). Ms. Faulkner concluded that while Plaintiff's impairment had been severe in the past, it was not severe at that time (Id.).

Plaintiff was messy and disheveled during a home visit on July 9, 2009 (Tr. 479). Plaintiff had no concerns with her medications or health (Id.) Later that month, Plaintiff told APN Brensike that she "ha[d]n't had meds in 2 months," was depressed, was anxious, and had racing thoughts (Tr. 482). She also reported seeing "shadows" (Id.).

By August 2009, Plaintiff told Ms. Faulkner that she had refilled her medications and was "doing ok" (Tr. 484-5). Plaintiff reported spending most of her time with her children (Id.). At the beginning of September, Plaintiff again reported she was "doing ok," taking her medicine daily, and had no concerns about her medication or physical health (Tr. 487). Ms.

5

Faulkner noted Plaintiff's mood and affect were normal (Id.). However, by September 15, 2009, APN Brensike noted that Plaintiff "ha[d]n't had meds in a few days" and was "not feeling right" (Tr. 489). Plaintiff stated that she was not sleeping well and had hallucinations (Id.).

During a home visit on October 21, 2009, Plaintiff reported that she was "doing ok" and stated that she had been taking her medicine everyday (Tr. 491). In November 2009, Ms. Faulkner noted that Plaintiff's mood and affect were normal (Tr. 492). The same day, APN Brensike noted Plaintiff's mood was better, her affect calmer, and she had increased frustration tolerance (Tr. 493). Plaintiff also denied depression or anxiety, though some irritability persisted. Plaintiff reported that she was taking her medication (though she was sometimes able to sleep without medication) and denied hallucinations (Tr. 493-4).

In December 2009, Plaintiff again reported taking her medication and no concerns about the medication or her health (Tr. 495, 497). On January 13, 2010, Ms. Faulkner noted that Plaintiff was appropriately dressed and groomed, had been taking medication daily, and had no concerns (Tr. 501). However, on January 26, 2010, Plaintiff stated that "she quit taking her medicine [because] it was making her sick" (Tr. 502).

In March 2010, Ms. Faulkner opined that Plaintiff had marked impairments with respect to ADLs; moderate impairments in interpersonal functioning; moderate impairments in concentration, task performance, and pace; and moderate impairments in adaption to change (Tr. 455-7, 508). Ms. Faulkner also opined that Plaintiff had a GAF score of 50 (Tr. 457). The same month, Laura Holt, NP, at MHC, noted that Plaintiff reported that she was not compliant with medications because "they make [her] sick" (Tr. 510). Plaintiff also reported poor sleep, decreased appetite, "awful" mood, and frequent crying episodes, but denied hallucinations. NP Holt noted Plaintiff's appearance was appropriate, she was cooperative, and had good eye contact, but her affect was tense and anxious. NP Holt adjusted Plaintiff's medications (Id.). During a home visit later that month, Ms. Faulkner noted that Plaintiff reported "doing ok" and was compliant with her medications (Tr. 512).

On April 7, 2010, Plaintiff told APN Brensike that she had been taking her medication and had no side effects, though she was not sleeping well (Tr. 514-5). Plaintiff appeared messy and disheveled (Tr. 515). Plaintiff reported continuing episodic depressed mood and irritability, though she enjoyed spending time with her kids (Tr. 514-5). On April 13, 2010 and May 7, 2010, Plaintiff again reported taking her medications and no current concerns (Tr. 516-7).

On June 1, 2010, Plaintiff appeared messy and disheveled during a home visit though

she reported taking her medication and no other concerns (Tr. 520). The next day, Plaintiff told APN Brensike that she was compliant with her medications and had no side effects, but was irritable (Tr. 521). Plaintiff had a positive pregnancy test and stated that she was "more depressed, more irritable, [but] now [she] know[s] why" (Id.). On June 14, 2010, Plaintiff reported taking her medications and no concerns about the medications (Tr. 514).

On June 25, 2010, APN Brensike opined that Plaintiff was mildly impaired with respect to her ability to understand and remember simple instructions; carry out simple instructions; and make judgments on simple work-related decisions (Tr. 451). APN Brensike also opined that Plaintiff was moderately impaired in her ability to understand and remember complex instructions; carry out complex instructions; and make judgments on complex work-related decisions (Id.). Finally, APN Brensike opined that Plaintiff was markedly impaired in her ability to interact appropriately with the public, supervisors, and co-workers; and respond appropriately to usual work situations and to changes in a routine work setting (Tr. 452).

In July 2010, Ms. Faulkner noted that Plaintiff was "very irritable and wasn't in a good mood" (Tr. 525). Plaintiff stated that she did not want to do therapy, but had been taking her medication daily. She requested that her medication be changed to injections (Id.). On August 9, 2010, Plaintiff stated that she "gets tired of taking pills every day" and again requested injections (Tr. 527). Plaintiff also noted that she was no longer pregnant because she had miscarried (Id.).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir.

1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

## B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r

8

of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred by failing to give proper weight to the opinion of a treating mental health care provider at Mental Health Cooperative (MHC),

9

Carrie Brensike, APN, who submitted a medical source statement dated June 25, 2010, in which marked limitations were noted with respect to plaintiff's ability to interact appropriately with others in the workplace. (Tr. 451-53)  With a degree in Advanced Practice Nursing and specialization as a psychiatric nurse practitioner (Tr. 453), Nurse Brensike is not an "acceptable medical source" under the regulations, but an "other source" whose opinion must be considered in reaching the disability determination.  20 C.F.R. § 416.913(a), (d)(1).  Such "other source" opinions are entitled to consideration along with all the relevant evidence of record, and "the [ALJ] generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence … allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  SSR 06-3p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006).  This is not a demanding standard.  Morris v. Comm'r of Soc. Sec., 2012 WL 4953118, at *11 (W.D. Mich. Oct. 17, 2012).  The ALJ in this case duly considered the assessment of Nurse Brensike, finding that her conclusions were belied by plaintiff's treatment records from MHC, as follows:

> Reviewing the [MHC] treatment records establishes that there is little, if any, rationally discernible pattern or connection between the limitations assessed, whether narratively or by GAF ratings.  Example:  in September 2008 when the claimant's GAF rating was 50 [(indicating serious psychological symptoms)], she was noted as: having many friends, being very social, being adjusted to change, and handling stress well.  Additionally, when compliant with medication, the claimant consistently reported that she was doing well.  Furthermore, she typically had no concerns, whatsoever.  Consequently, the claimant's reported low GAF scores and opinion of Ms. Brensike are given little weight.

(Tr. 25)

Curiously, plaintiff contends that "[t]he only reasoning provided by the ALJ for rejecting APN Brensike's opinion was based on GAF scores." (Docket Entry No. 12-1 at 7) However, the foregoing rationale clearly draws a distinction between the relatively benign symptoms observed in the notes of plaintiff's treatment, versus the more dire limitations contained in Nurse Brensike's narrative report and embodied in the GAF scores assigned by MHC personnel. Plaintiff is simply wrong in interpreting the ALJ's rejection of Nurse Brensike's assessment as being based on an accreditation of GAF scores which are inconsistent with that assessment. Furthermore, plaintiff incorrectly argues that Nurse Brensike's assessment is due "complete deference" or, alternatively, the provision of "good reasons" for its rejection, based on its status as a treating source opinion. Id. at 8. "Only acceptable medical sources can express medical opinions entitled to controlling weight under the treating physician rule." Morris, 2012 WL 4953118, at *11 (citing Cole v. Astrue, 661 F.3d 931, 939 (6th Cir. 2011)). Nurse Brensike is not an acceptable medical source, and so her assessment is not due any particular deference or procedural protection.

Plaintiff next contends that the ALJ erred in failing to properly evaluate her credibility as required by SSR 96-7p. Plaintiff correctly notes that this ruling requires the ALJ to articulate specific reasons for his or her finding that a claimant is not fully credible, and not to merely make a single, conclusory statement that the claimant is not credible, or that the factors affecting credibility have been considered and the claimant's testimony is rejected. SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. July 2, 1996). However, inexplicably, plaintiff proceeds to argue that "[h]ere, the ALJ made such a boilerplate, 'conclusory statement,' and therefore did not comply with SSR 96-7p. Further, the reasons that were provided by the ALJ for finding the claimant to not be entirely credible were not an accurate

11

reflection of the testimony and the record as a whole." (Docket Entry No. 12-1 at 10) As referenced in the second part of plaintiff's quoted argument, the ALJ did in fact provide specific reasons for finding plaintiff not entirely credible:

> The claimant indicated that she stopped work in 2005 because she gave birth. The claimant later said that she had done so because she did not like to be around others. Additionally, she initially did not allege disability until 2007. The claimant also consistently reported no concerns at all, and was reportedly non-compliant with medications on several occasions. Furthermore, the record suggests that the claimant's symptoms are frequently associated with family issues. However, she reported on more than one occasion, that she enjoyed being with her children. The claimant is not persuasive regarding the severity of her symptoms to the extent that she alleged.

(Tr. 26) The ALJ further made a detailed accounting of the record of plaintiff's treatment at MHC (Tr. 23-24), taking note of the repeated correlation between her noncompliance with prescribed medication therapy and an increase in her depressive symptoms.

All of the factors cited by the ALJ in support of his credibility determination were appropriately considered, and his rationale is not in conflict with agency regulations or SSR 96-7p. An ALJ's credibility determination is due considerable deference on judicial review since the ALJ, unlike the Court, has the opportunity to observe the plaintiff while testifying. E.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). The undersigned finds no error in the ALJ's credibility determination here.

Plaintiff next challenges the ALJ's failure to state how much weight, if any, he assigned to the marked limitations in her abilities related to concentration, task performance, and pace which were assessed in the Tennessee Clinically Related Group (CRG) forms (Tr. 346, 349, 459) which also contained her GAF ratings. Plaintiff maintains that the ALJ was required to explicitly evaluate these assessments as "other source" evidence pursuant to SSR

06-3p. However, again, SSR 06-3p does not require ALJs to give explicit attention to every shred of opinion evidence, as detailed below:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision....

2006 WL 2329939, at *6. Thus, ALJs should make explicit their consideration of "other source" evidence, if not the actual weight such evidence is given, where that evidence could potentially sway the ultimate determination of the claimant's case toward a finding of disability. Conversely, the ALJ *must* explain his or her weighing of such evidence in cases where the evidence is held to outweigh a treating source's medical opinion, as evidence of the claimant's ability to perform work.

In this case, the ALJ gave greatest weight to the opinion of nonexamining consultant Dr. Rebecca P. Joslin, Ed.D., which was found most consistent with the evidence as a whole, and which specifically noted that the "[medical assessment] of marked in {concentration, persistence and pace]" obtained "when [claimant] not taking meds as prescribed." (Tr. 416) Moreover, these assessments of marked limitations are fairly deemed among "the limitations assessed ... narratively" which, along with the assessed GAF scores, were found to be outweighed by the inconsistent reports in the treatment notes that she was doing well and had no concerns when taking her prescribed medications. (Tr. 25) No

further explicit attention was due these CRG checkbox assessments.

Plaintiff additionally finds fault with the ALJ's failure to include his finding of her ability to "maintain concentration and persistence for two -to three-step tasks with routine supervision" in his hypothetical question to the vocational expert. However, the ALJ's hypothetical incorporated the ability to "understand, remember and carry out at least two-to three-step directions and can perform at least two-to three-step tasks with normal routine supervision." (Tr. 58) Plainly, the ability to concentrate and persist through two- to three-step tasks is subsumed within the hypothesized ability to "carry out" and "perform" such tasks. There is no error here.

Finally, plaintiff argues that the ALJ erred in failing to find plaintiff's bipolar disorder to be a severe impairment at the second step of the sequential evaluation process, or in failing to explain a finding of nonseverity. However, as pointed out by defendant, the single medical record which plaintiff asserts as support for her diagnosis of "bipolar disorder NOS [(not otherwise specified)]" (Tr. 265) predates her alleged disability onset date by more than a year. For the entirety of plaintiff's mental health treatment at MHC following her alleged onset date (and beginning prior thereto, on July 12, 2007), the bipolar NOS diagnosis has been replaced by a diagnosis of "Major Depressive Disorder, Recurrent, Unspecified Primary." (E.g., Tr. 425) Given this record and the relevant timeframe, as well as the fact that these mood disorders have numerous features in common, there was plainly no error in the failure to find severe the outdated bipolar diagnosis.

In sum, the decision of the ALJ is supported by substantial evidence on the record as a whole, and is therefore due to be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the SSA be **AFFIRMED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 2nd day of April, 2015.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE